UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| W.N. MOTORS, INC. d/b/a COASTAL NISSAN, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 21-cv-11266-ADB |
| | * | |
| | * | |
| NISSAN NORTH AMERICA, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff W.N. Motors, Inc. d/b/a Coastal Nissan ("Coastal") alleges that Defendant

Nissan North America, Inc. ("NNA") violated various provisions of the Massachusetts statute

governing car distributors and dealers.  [ECF No. 1-1 ("Complaint" or "Compl.") at 5–29].

Currently before the Court is NNA's motion for summary judgment.  [ECF No. 69].  For the

reasons set forth below, NNA's motion is <u>DENIED</u> as to Count II and <u>GRANTED</u> as to Count

III.

## I.      BACKGROUND

### A.      Statutory Scheme

Massachusetts General Laws Chapter 93B, the so-called "Dealers' Bill of Rights,"

<u>Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc.</u>, 547 F.3d 38, 40 (1st Cir. 2008),

"regulates business practices between motor vehicle manufacturers, distributors and dealers."

<u>Petrosyan v. Maserati N. Am., Inc.</u>, No. 19-cv-12425, 2020 WL 2104789, at *3 (D. Mass. May 1, 2020).  The statute is "aimed primarily at protecting motor vehicle dealers from injury caused by the unfair business practices of manufacturers and distributors with which they are associated, generally in a franchise relationship."  <u>Mass. State Auto. Dealers Ass'n v. Tesla Motors MA, Inc.</u>, 15 N.E.3d 1152, 1153 (Mass. 2014); <u>see also</u> Mass. Gen. Laws ch. 93B, § 3.

Section 3 of Chapter 93B makes "[u]nfair methods of competition and unfair or deceptive acts or practices" unlawful.  Mass. Gen. Laws ch. 93B, § 3(a).  Under Section 4, these enumerated "unfair methods" and "unfair or deceptive acts or practices" include:

- "[A]ny action [by a distributor such as NNA] which is arbitrary, in bad faith, or unconscionable and which causes damage." <u>Id.</u> § 4(a).

- Price discrimination, specifically "for . . . a distributor . . . to . . . sell any new motor vehicle to any motor vehicle dealer located in the commonwealth [of Massachusetts] at a lower actual price therefor than the actual price offered contemporaneously to any other motor vehicle dealer located in the commonwealth for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in the lesser actual price unless available on equal terms to all dealers located in the commonwealth . . . ." <u>Id.</u> § 4(c)(5).

Section 17 of Chapter 93B further provides:

> [A]ctions arising out of this chapter shall be commenced <u>within 4 years next after the cause of action accrues</u>; but if a person liable hereunder fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of its cause of action by the person so entitled shall be excluded in determining the time limit for the commencement of the action.

<u>Id.</u> § 17 (emphasis added).

### B.      Factual Background

Except as otherwise noted, the following facts are either not in dispute or stated in the light most favorable to Coastal, the non-movant.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).[1]

### 1.      The Parties

Coastal is an authorized Nissan dealer based in Norwell, Massachusetts.  [SOF ¶ 1].  NNA "distributes Nissan-branded motor vehicles and related products in the United States through a network of authorized dealers like Coastal, which in turn sell Nissan vehicles to retail customers."  [Id. ¶ 2].

### 2.      Primary Market Areas ("PMAs")

On February 28, 2005, Coastal and NNA entered into the Nissan Dealer Sales and Service Agreement (the "Dealer Agreement"), which gave Coastal the right to sell and service new Nissan vehicles.  [SOF ¶ 3]; see also [ECF No. 70-1 (the "Dealer Agreement")].

Section 3 of the Standard Provisions outlines Coastal's general obligations as a NNA dealer and requires, among other things, that it "actively and effectively promote . . . the sale [of Nissan vehicles] at retail" within its Primary Market Area ("PMA").  [Dealer Agreement, § 3.A at 13].[2]  The PMA "represents the area where the dealer has a competitive advantage over other

---

[1] The Court draws the facts, unless otherwise stated, from the parties' combined Rule 56.1 statement of material facts, which is Coastal's Response to NNA's Statement of Undisputed Material Facts, [ECF No. 73 ("SOF")], and documents referenced therein.  The Court refers to each "Statement" and "Response" as a combined paragraph number.

[2] The Fifth Article of the Dealer Agreement incorporates the Standard Provisions.  [SOF ¶ 2].

Nissan dealers solely based on location" and is the geographic area over which the dealer has sales and service responsibility.  [Id.; ECF No. 70-2 ("Kittleson Decl.") ¶ 3].[3]

As relevant to the discussion infra, so-called "open points" are unassigned census tracts where NNA seeks to have, but currently does not have, dealer representation.  [Compl. ¶ 58; Kittleson Decl. ¶ 8].  "An 'open point' also may be created where an existing Nissan dealer voluntarily terminates its dealer agreement and ceases operation" and NNA has not filled the open point with a new dealer.  [Kittleson Decl. ¶ 8; Compl. ¶¶ 59–60].

### 3.    Sales Objectives and Performance

The Dealer Agreement provides that Coastal's "performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by [NNA] on the basis of such reasonable criteria as [NNA] may develop from time to time . . . ."  [Dealer Agreement, § 3B at 13].[4]

---

[3] The PMAs are comprised of "census tracts," which are geographic units as defined by the U.S. Census Bureau and represent statistical data such as population size.  [Kittleson Decl. ¶ 3].   A dealer's PMA consists of census tracts that "are generally closer to the dealer's location than other Nissan dealers."  [Id. ¶ 3].  NNA adjusts PMAs based on each U.S. decennial census.  [Id. ¶¶ 4–5].

[4] The Dealer Agreement then lists various evaluation methods, "including, for example . . . 2. Dealer's sales . . . in Dealer's Primary Market Area . . . as a percentage of: (i) registrations of Nissan Cars and Nissan Trucks; … 3. A comparison of Dealer's sales and/or registrations to sales and/or registrations of other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located . . . 4. A comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors."  [Dealer Agreement, § 3B at 13].  Section 3D further lists "[a]dditional [f]actors for [c]onsideration" for evaluating a dealer's sales performance, including "the Dealership location; the general shopping habits of the public in such market area; the availability of Nissan Vehicles Dealer to other Authorized Nissan Dealers; any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance."  [Dealer Agreement, § 3D at 13–14].

Between 2013 and 2021, NNA used various sales metrics to evaluate the sales performance of its dealers, including as relevant here, the State Sales Effectiveness Represented ("SSER") and the Localized Sales Effectiveness ("LSE").

In August 2013,[5] NNA informed its dealers, including Coastal, that:

> Effective with the release of June 2013 vehicle registration information, Nissan will begin to <u>utilize the average sales penetration of Nissan dealers in your state in the market areas where Nissan is represented</u> (i.e. State Sales Effectiveness Represented or "SSER") as the primary benchmark for evaluating the sales effectiveness of your dealership.

[ECF No. 77-1 at 2 (emphasis added)].[6]

---

[5] Prior to June 2013, NNA used the "Regional Sales Effectiveness" ("RSE") metric to measure a dealer's sales performance.  [ECF No. 70-4 at 14]; <u>see also</u> [ECF No. 77-1 at 2 ("Historically Nissan has utilized a comparison of a dealer's sales penetration to the average sales penetration of all Nissan dealers within that dealer's assigned region on a segment adjusted basis as its primary benchmark for evaluating a dealer's sales effectiveness")].  The RSE "compared [a] dealer's sales penetration to the average sales penetration of all Nissan dealers in a dealer's region or, in this case, in Nissan's Northeast Region."  [ECF No. 70-4 at 14].  Importantly, the RSE included open points when calculating the sales effectiveness.  [ECF No. 76-4 (Kittleson Dep.) at 12:12–15 ("Q. And prior to 2013, Nissan was using all of the geography, including open points for measuring sales effectiveness, correct.  A. Correct.")].

[6] Neither party provides a clear definition of sales penetration, <u>see generally</u> [SOF; ECF Nos. 70, 72, 79], but the parties dispute the accuracy of the sales penetration factor used in the SSER, <u>see</u> [SOF ¶ 7].  As the Court understands it, sales penetration refers to the proportion of actual sales to expected sales for a Nissan dealer in its assigned PMA.  <u>See</u> [ECF No. 70-4 at 13–14 ("Nissan [after assigning a PMA] can then calculate each dealer's 'sales penetration' which is: (i) the dealer's total retail Nissan sales during the previous performance period as a percentage of (ii) all competitive vehicles (i.e., Nissans or brands with which Nissan competes) that were registered by customers in the dealer's PMA during the same period. Sales penetration reflects the degree to which a dealer captures the available competitive sales opportunities.")]; [ECF No. 72 at 16 ( describing "sales penetration" as "the percentage of sales Nissan deals should be making based upon total Nissan sales in Massachusetts as a factor of all competitive registrations")]; [ECF No. 74 (Coastal Expert Decl.) ¶ 6 (sales penetration for the SSER is derived from: "Massachusetts Nissan dealer sales anywhere (including in open points and unrepresented territories) divided by competitive registrations in areas assigned to a Massachusetts Nissan dealer's PMA (does not include open points or unrepresented territories)"].  Achieving a SSER score of 100% means that

According to a 2013 internal NNA slide deck on how to calculate the SSER, which was not shared with Coastal or other dealers, [ECF No. 76-4 (Kittleson Dep.) at 14:13–24], the formula for calculating the SSER was as follows:  All Retail Nissan Dealer States in Represented State (nominator) over Retail Sales and Competitive Registrations in Represented State (denominator).  [ECF No. 76-5 at 6].  As relevant here, the slide deck provided that "Open Points and Unassigned geography are ***not*** included in the standard calculation."[7]  [Id. at 6 (emphasis in the original)].

Then, in or around October 2020, NNA transitioned from the SSER metric to LSE, which NNA claims, but Coastal disputes, is a more localized metric as it "benchmark[ed] a dealer's sales penetration against that of dealers on a more local geography than the state level."  [SOF ¶ 8].

### 4.    NNA's Incentive Programs

Between 2014 and 2021, NNA offered various volume-based incentive programs ("VBIs"), which monetarily rewarded retailers "if they achieved certain retail sales objectives on a monthly, quarterly and annual basis."[8]  [Id. ¶¶ 9, 12].  These programs were called the Nissan

---

a dealer sold the number of vehicles it was expected to sell based on the sales penetration.  [ECF No. 70-4 at 14].

[7] Coastal contends that it is inaccurate that "NNA exclude[d] sales made by Nissan dealers in unrepresented territories."  [ECF No. 72 at 16].  Specifically, Coastal argues that the numerator did in fact include sales to consumers in unrepresented areas, but the denominator excluded competitive registrations in unrepresented areas.  See [ECF No. 74 (Coastal Expert Decl.) ¶¶ 4–6].  This, Coastal avers, resulted in an artificial inflation of the "sales penetration" expectation for Nissan dealers.  [ECF No. 72 at 17 ("By including unrepresented PMA sales in the numerator, and excluding unrepresented territories in the denominator, NNA arbitrarily increased the Nissan brand's penetration into the Massachusetts market. . . . [I]f the sales penetration factor is flawed and inflated, so too are the sales expected of the dealer.")].

[8] Coastal appears to refer to these programs collectively as "stair-step" programs.  See [Compl. ¶¶ 99–116].

10 Sales Growth Program ("SGP"), the Nissan Sales Rewards ("NSR"), which was launched in April 2018 and discontinued in October 2019, and the Dealer Volume Bonus ("DVB") program, which replaced NSR but was terminated at the end of March 2021.  [Id.].[9]

These programs used a dealer's sale effectiveness, whether measured using the SSER or LSE metric, "as an input to adjust the dealer's objective upward or downward to ensure that NNA set reasonable objectives based on the opportunity availability in a dealer's PMA."  [SOF ¶ 11].  As a result, the metrics by which the SSER or LSE were calculated had an impact on a dealer's ability to reap the benefits of NNA's incentive programs.  See [Id. ¶ 15].

### 5.  2012-2022: Coastal's PMA and Sales Performance

In April 2012, approximately seven years after Coastal entered into the Dealer Agreement, NNA informed Coastal that its PMA had been revised.  [ECF No. 76-2 at 2 ("2012 Nissan Letter")].  NNA noted that because of the 2010 U.S. census data, Nissan had "completed a comprehensive review of all Nissan Dealer PMAs," and, as a result, revised Coastal's PMA. [Id. at 2].  Specifically, it assigned Coastal a PMA with thirty-three tracts, referred to as the "Norwell PMA."  [Id. at 6].

On September 1, 2014, after NNA introduced the SSER methodology, Coastal notified NNA that in "analyzing [its] PMA to improve sales, [it] [had] discovered several issues

---

[9] Under these programs, according to Coastal, "NNA paid increasingly larger incentives based on a dealer's attainment of its objective."  [ECF No. 70-3 at 2 ("So, for example, under the SGP program, NNA might pay an incentive of $80 per vehicle sold at retail when a dealer attained 80% of its objective in a given month; $160 per vehicle when a dealer attained 90% of its objective; $240 per vehicle when a dealer attained 100% of its objective; and $290 per vehicle when a dealer attained 110% of its objective.")].

regarding the geographic configuration of its PMA," requiring NNA's attention.  [ECF No. 70-4 at 38].[10]  Specifically, Coastal noted that:

> We looked at the census tracts assigned to the Norwell PMA to determine customer drive distance from the assigned census tract [] to Coastal in comparison to the drive distances to the nearest neighboring Nissan dealers[].  We also reviewed NISSAN USA's "Dealer Location" search engine to review the U.S. Postal Zip Codes which correspond to Coastal Nissan's assigned PMA.  Our review of the Norwell PMA found that [four] []census tracts were inappropriately assigned to Coastal . . . .

[Id.].  Coastal requested that NNA remove those four census tracts.  [Id.].

After receiving no response from NNA, Coastal sent a follow-up letter on November 18, 2014, stating that it had "pointed out several issues regarding the geographic configuration of [its] PMA which require [NNA's] attention."  [ECF No. 70-4 at 21].  Coastal further noted that "a dealer's PMA has a significant impact on new vehicles sales objective [sic] under the current Sales Growth Program (SGP)," which was NNA's volume-based incentive program at that time. [Id.].

NNA replied to Coastal's queries on January 27, 2015, stating that it "applies a standard methodology to ensure that PMA assignments are fair and equitable," and concluding that "the PMA signed to Coastal [] is reasonable and proper."  [ECF No. 70-4 at 41].  NNA declined to make adjustments to Coastal's PMA.  [Id.].

---

[10] [ECF No. 70-4] comprises multiple documents: Declaration of Lisa K. Haines (pages 1–3); Defendant's Answer to Plaintiff's First Set of Interrogatories (pages 4–19); Coastal's letter to NNA dated November 18, 2014 (pages 20–22); Richard Walker's excerpted deposition testimony (pages 23–37); Coastal's letter to NNA dated September 1, 2014 (pages 38-40); and NNA's letter to Coastal dated January 27, 2015 (page 41).

In response to NNA's January 2015 letter, Coastal followed up once again in April 2016. [ECF No. 79-1].  Specifically, Coastal alerted Nissan to the fact that it was not listed as the primary dealer on Nissan's website for certain zip codes within its PMA and noted that:

> This has been an issue since the implementation of the SGP program on April 1st, 2014 and is negatively impacting our performance. Currently, there is a conflict between Nissan's PMA assignments and your marketing efforts to support the dealer body.  **In our case, surrounding dealers are being provided enhanced and preferred marketing support in the form of increased visibility on your website's dealer locator.  Coastal Nissan is expected to somehow capture the sales for the very prospects you are directing to our competing dealers**. . . . .
>
> We feel strongly that the current arrangement on your site is significantly impacting our sales performance as it relates to SSER, our objectives under the SGP program, and the dealership's ability to earn all applicable incentive funds under these programs.

[ECF No. 79-1 at 4–5 (emphasis in original)].

Thereafter, on January 19, 2018, NNA reached out to Coastal, stating that it had concerns with regards to Coastal's sales performance.  [ECF No. 1-1 at 31–32].[11]  A few weeks later, on March 29, 2018, Coastal responded:

> Nissan's failure to assign Coastal Nissan a proper PMA has negatively impacted the dealership's ability to achieve 100% SSER. In addition, Coastal Nissan continues to object to NNA's use of SSER as the basis for determining whether the dealership is effectively promoting the sale of new Nissan vehicles in the PMA. Coastal's failure to achieve 100% SSER does not equate to a failure to meet its contractual obligations under its Dealer Agreement. For example, SSER formula does not consider local market conditions (such as where customers tend to shop, where residents work, and other demographic factors) that might negatively affect Coastal Nissan's ability to sell to customers in parts of our PMA.

---

[11] The January 19, 2018, letter was attached as Exhibit A to the Complaint.  [ECF No. 1-1 at 30–32].

[ECF No. 1-1 at 35].[12]

At the request of Coastal, NNA audited the Norwell PMA in November 2018 and ultimately determined that Coastal's PMA should not be modified.[13]  [ECF No. 78-11; Compl. ¶ 87; ECF No. 1-1 at 47; ECF No. 70-4 at 7].  Coastal contests the methodology applied and the accuracy of the 2018 Audit.  [Compl. ¶¶ 90–96; ECF No. 1-1 at 45, 47; ECF No. 72 at 20].

In 2022, NNA revised Coastal's PMA again, adding and removing census tracts, thereby bringing Coastal's PMA to a total of forty tracts.  Compare [ECF No. 76-3 at 6], with [ECF No. 76-2 at 6].

### C.   Procedural History

Coastal filed this suit in the Business Litigation Session of the Suffolk County Superior Court on July 2, 2021, see [ECF No. 1-1 at 29], alleging that (1) NNA's Warranty Charge violated Chapter 93B, § 9(b)(2)(vii) (Count I) and (2) NNA violated Chapter 93B, §§ 3(a), 4(a), 4(c)(12) and 4(c)(5) (Count II), and seeking injunctive relief (Count III).[14]  [Compl. at 20–28].  On August 4, 2021, NNA removed the case to this Court.  [ECF No. 1].  The Court granted NNA's motion to dismiss Count I (and Count II insofar as it relates to the Warranty Charge) on

---

[12] The March 29, 2018, letter was attached as Exhibit B to the Complaint. [ECF No. 1-1 at 34-37].  Although the letter is dated March 29, 2017, this is a typographical error, and the correct date is March 29, 2018.  [Compl. ¶ 77].

[13] Urban Science personnel assisted in conducting the audit.  [Compl. ¶ 87].

[14] Although the Complaint refers to § 4(b)(12), the Court, in its order on NNA's motion to dismiss, [ECF No. 18], assumed that Coastal meant to cite to § 4(c)(12), which prohibits distributors and manufacturers from violating Chapter 93B via affiliates.  § 4(c)(12); [ECF No. 18 at 10 n.10].  The Court found that Coastal had failed to state a viable claim under § 4(c)(12) based on the Warranty Charge and separately noted that its failure to allege facts that NNA acted via any affiliate was "fatal to its claim."  [ECF No. 18 at 10, id. n.10].  Accordingly, Coastal's claim under § 4(c)(12) has been dismissed.

October 5, 2021.  [ECF No. 18].  On November 3, 2023, NNA filed the instant motion for

summary judgment, [ECF No. 69], Coastal opposed on December 1, 2023, [ECF No. 72], and

NNA filed its reply on December 22, 2023, [ECF No. 79].

## II.     DISCUSSION

### A.     Legal Standard

Summary judgment is appropriate where the moving party can show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A dispute "is 'genuine' if it 'may reasonably be resolved in favor of

either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v.

Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)), aff'd, 706 F.3d 25 (1st Cir. 2013).  "A fact is

material if its resolution might affect the outcome of the case under the controlling law."

Cochran, 328 F.3d at 6 (citation omitted).  Thus, a "genuine issue exists as to such a fact if there

is evidence from which a reasonable trier could decide the fact either way."  Id. (citation

omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence

is insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, Great

Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v.

Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must "'affirmatively produce evidence that negates an essential element of the non-moving

party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-

moving party will be unable to carry its burden of persuasion at trial.'"  Ocasio-Hernández v.

Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132

(1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment,

the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012) (citation omitted), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### 1.    Count II

Coastal alleges that NNA's use of the SSER as a sales performance metric from at least July 2017 through January 1, 2021, its 2018 audit of Coastal's PMA, and its use of volume-based sales incentives programs from October 2019 until March 2021 were arbitrary, unfair, and unobjective, and, consequently, in violation of M.G.L. c. 93B, §§ 3–4.  [Compl. ¶¶ 132–72].

With regards to the SSER, Coastal contends that, among other things, the SSER did not account for local market conditions in the Norwell PMA and objects to how NNA used unassigned geographic areas (the open points), for the purpose of calculating expected sales.

[Compl. ¶¶ 70–71].[15]  In addition, Coastal avers that the SSER methodology gave an unfair sale advantage to those Nissan dealers who abutted open points, as they were able to sell into unrepresented points "without having any sales responsibility for that area."  [Id. at ¶ 74].  As a result, NNA "created an unfair playing field when it implemented the SSER."  [Id.].

As to the 2018 Audit, Coastal claims that it was unfair and arbitrary because, among other things, NNA only audited seven of the census tracts assigned to the Norwell PMA, relied on the SSER scores as the basis for keeping certain census tracts assigned to Coastal, and did not consider other relevant factors, such as drive time or commuting patterns for consumers traveling between the audited census tracts and other nearby Nissan dealers.  [Compl. ¶¶ 90–96].

In relation to the stair-step incentives programs, NNA's volume-based incentive programs, Coastal alleges that NNA would "frequently change the formula and methodology used to calculate the number of new vehicle sales to be achieved by Coastal [] to qualify for the volume-based incentive programs" and, in addition, change the eligible sales types for the program.  [Compl. ¶¶ 102–03].  Separately, Coastal also asserts that it was disadvantaged because NNA relied on the faulty SSER to define program objectives, which impacted Coastal's profitability.  [Id. ¶¶ 110, 112].

In response, NNA contends that Coastal's claims accrued as "early as April 2012 and no later than 2015" and are therefore time-barred under Chapter 93B's four-year statute of limitations.  [ECF No. 70 at 16]; see also Mass. Gen. Laws ch. 93B, § 17.  Specifically, NNA claims that it told Coastal in January 2015 that it "did not intend to change" Coastal's PMA and,

---

[15] Specifically, Coastal alleges that the SSER was calculated using only vehicle registrations from represented PMAs and excluded vehicle registrations in open points, thereby artificially inflating Coastal's expected sales objectives.  [Compl. ¶¶ 70, 73; see also ECF No. 74 (Coastal Expert Decl.) ¶¶ 4–6].

consequently, any Chapter 93B claims "relating to [Coastal's] PMA assignment were time-barred no later than January 2019." [ECF No. 70 at 17].  Likewise, because NNA began using the SSER around August 2013, NNA argues Coastal was "well aware of its assigned PMA[,] the impact of this PMA construction on its own SSER score and the purported impact of 'open points' on the SSER scores of Nissan dealers abutting those markets[, as well as] [by January 2015], the resultant impact on the incentives available to Coastal." [Id. at 18].  As to the volume-based incentive programs, NNA had already begun offering these programs as early as April 2014, meaning that "Coastal was well aware of NNA's 'methodologies' and the resultant impact on the incentives available to Coastal . . . no later than January 2015." [Id.].

Coastal replies that pursuant to the discovery rule, the statute of limitations did not accrue until late 2018 and 2019 because, as a result of NNA's unwillingness to share pertinent information, it did not "have a full understanding of how NNA was using [the SSER] metric to Coastal's detriment" until then. [ECF No. 72 at 9].  In addition, Coastal accuses NNA of concealing material information, such as the impact of open points on the SSER, until 2017 or 2018 and claims that, accordingly, NNA's conduct tolled the statute of limitations. [Id. at 10–12].

### i.  The Discovery Rule

Pursuant to Massachusetts's general discovery rule, a cause of action does not accrue until a plaintiff knows or reasonably should know that he was injured by the defendant's conduct.[16]  See First Choice Armor & Equip., Inc. v. Toyobo Am., Inc., 717 F. Supp. 2d 156,

---

[16] Courts in Massachusetts have applied the discovery rule to a range of actions, including contract, torts, and Chapter 93A cases.  See Metlife Auto & Home v. ADT Sec. Sys., Inc., No. 10-cv-10679, 2011 WL 1223023, at *5 (D. Mass. Mar. 31, 2011) (citing Szymanski v. Boston

164 (D. Mass. 2010).  "[T]he discovery rule does not grant [a] plaintiff[] the option of ignoring

connections once they have been made aware of them.  In fact, one does not have to fully

comprehend the full extent or nature of an injury in order for a cause of action to accrue."  <u>Koe v.

Mercer</u>, 876 N.E.2d 831, 837 (Mass. 2007).  "Instead, the statute of limitations begins to run

when a plaintiff has 'knowledge or sufficient notice that [he] was harmed and . . . knowledge or

sufficient notice of what the cause of [the] harm was.'"  <u>Id.</u> (quoting <u>Bowen v. Eli Lilly & Co.</u>,

557 N.E.2d 739, 742 (Mass. 1990)).  As such, the discovery rule exception is "narrow, as it

applies only to harms that are 'inherently unknowable.'"  <u>Maldonado v. AMS Servicing LLC</u>,

No. 11-cv-40044S, 2012 WL 220249, at *5 (D. Mass. 2012) (quoting <u>Saenger Org., Inc. v.

Nationwide Ins. Licensing Assoc., Inc.</u>, 119 F.3d 55, 65 (1st Cir. 1997)).  "The factual basis for a

cause of action is inherently unknowable if it is incapable of detection by the wronged party

through the exercise of reasonable diligence."  <u>Gonzalez v. United States</u>, 284 F.3d 281, 288–89

(1st Cir. 2002) (internal quotation marks omitted) (quoting <u>Geo. Knight & Co. v. Watson Wyatt

& Co.</u>, 170 F.3d 210, 213 (1st Cir. 1999)).  "The discovery rule does not require that a plaintiff

know the specific details pertaining to an alleged harm, . . . instead it imposes a 'duty to

---

<u>Mut. Life Ins. Co.</u>, 778 N.E.2d 16, 20 (Mass. App. Ct. 2002)).  The Court, however, is not aware
of, and neither party directs the Court to, any case where a court has applied the discovery rule to
a Chapter 93B claim.  Given the close relationship between 93A and 93B (namely, that 93B was
enacted specifically to govern unfairness contemplated in the Massachusetts automotive
industry), the Court sees no compelling policy reason (and the parties do not offer any) to deny
application of the discovery rule to 93B claims.  <u>See</u> <u>Krasnow v. Allen</u>, 562 N.E.2d 1375, 1380
(Mass. App. Ct. 1990) ("Determining how far to extend the discovery rule requires a balancing
between competing policies: the policy of fairness to claimants who may have incomplete
knowledge of the facts giving rise to their claim, which underlies the discovery rule; and the
policies of repose and fairness to defendants, who may be disadvantaged by delay in defending
themselves, which underlie time limitations on litigation."); <u>see also</u> <u>Reiter Oldsmobile, Inc. v.
Gen. Motors Corp.</u>, 393 N.E.2d 376, 378 (Mass. 1979) ("Chapter 93B was enacted after c. 93A
and applies specifically to unfairness in one industry.").

investigate' on a plaintiff who has cause for concern." <u>Epstein v. C.R. Bard, Inc.</u>, 460 F.3d 183, 188 (1st Cir. 2006) (quoting <u>Doucette v. Handy & Harmon</u>, 625 N.E.2d 571, 573 (Mass. App. Ct. 1994)).  "Once a plaintiff relies upon the discovery rule to argue that his claim was delayed due to an inability to recognize the cause of his injuries, he bears the burden of proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge." <u>Koe</u>, 876 N.E.2d at 836 (internal quotation marks omitted).

"Where compliance with a statute of limitations is at issue, 'factual disputes concerning when a plaintiff knew or should have known of his cause(s) of action are to be resolved by the jury.'" <u>Patsos v. First Albany Corp.</u>, 741 N.E.2d 841, 847 (Mass. 2001) (quoting <u>Riley v. Presnell</u>, 565 N.E.2d 780, 787 (Mass. 1991)).  As a result, the resolution of these questions is typically not appropriate at the summary judgment stage.  <u>See</u> <u>Stanley v. Schmidt</u>, 369 F. Supp. 3d 297, 314–15 (D. Mass. 2019) ("Ultimately, the question of when a plaintiff should have known and when a plaintiff should have asserted her rights, are questions of fact 'often unsuited for summary judgment' unless 'the facts regarding discovery of harm are undisputed.'" (quoting <u>Mass. Hous. Opportunities Corp. v. Whitman & Bingham Assocs., P.C.</u>, 983 N.E.2d 734, 737 (Mass. App. Ct. 2013))).

In order to survive NNA's motion for summary judgment based on the statute of limitations, Coastal "must show a genuine issue of material fact as to whether it knew or should have known of its claims" before July 2017.[17]  <u>Cambridge Plating Co. v. Napco, Inc.</u>, 991 F.2d 21, 29 (1st Cir. 1993).  The Court finds that such a dispute exists.

---

[17] Coastal filed the action in state court on July 2, 2021.  [ECF No. 1-1 at 29].

On the one hand, a fact finder could find that Coastal had sufficient notice that it was being harmed by NNA's PMA allocation and performance metrics sometime between late 2014 and early 2016.  Coastal contacted NNA in 2014 about its concerns regarding the "geographic configuration" of its PMA.  [ECF No. 70-4 at 21, 38].  Then, in April 2016, in response to NNA's January 27, 2015 letter in which it claimed that Coastal's PMA assignment was "reasonable and proper," [id. at 41], Coastal once again raised concerns, including that it was not listed as the primary dealer for certain zip codes within its PMA, [ECF No. 79-1 at 4].  In that communication, Coastal stated that its concerns with its PMA "ha[ve] been an issue since the implementation of the SGP program on April 1ˢᵗ, 2014," [id.], and "w[ere] significantly impacting [its] sales performance as it relates to SSER, [its] objectives under the SGP program, and the dealership's ability to earn all applicable incentive funds under these programs," [18] [id. at 5].  Thus, although Coastal may not have had full knowledge of the extent or precise nature of its injury at that time, such as the interplay between open points and the calculation of the SSER, see Koe, 876 N.E.2d at 837, a jury could reasonably conclude that Coastal was, at that point, "informed of the facts that suggest [it] ha[d] been injured."  Pagliuca v. City of Boston, 626 N.E.2d 625, 628 (Mass. Ct. App. 1994) ("[P]laintiff may be put on 'inquiry notice' when he is informed of the facts that suggest he has been injured." (citing Felton v. Labor Relations Commn., 598 N.E.2d 687, 689–90 (Mass. Ct. App. 1992))); see also Szymanski v. Bos. Mut. Life Ins. Co., 778 N.E.2d 16, 20–21 (Mass. Ct. App. 2002) ("Notice . . . refers not to discovery of every fact necessary to prevail on the claim, but rather to discovery of the plaintiff's injury as

---

[18] For example, Richard Walker, Coastal's owner, testified that he knew by 2014 that the PMA configuration "impacted [his] SSER score."  [ECF No. 70-4 (Walker Dep.) at 34:22-35:15; see also id. at 33:1-5 ("Q. And in 2014 Nissan was using this PMA as part of the calculation for your SSER score, correct? A. Right.")].

causally connected to the defendant's negligence" (citation omitted)); [19] see also [ECF No. 70-4 (Walker Dep.) at 29:19–30:1 ("Q. And you made a written complaint to Nissan about [the Powell PMA] on September 1st, 2014? A. Correct. Q. And you continued complaining about the configuration or raising concerns about the configurations in the years subsequent?  A. I had concerns subsequent to '14, and, my concerns continued, and they went unaddressed.")]; [id. at 32:19–25 ("Q. And this [referring to PMA discussed in the 2015 Letter] was the PMA Coastal is challenging in this litigation, correct? A. Correct.  The PMA that was configured in . . . 2011, 2013.  Q. And that you began complaining about it in 2014?  A. Correct.")]; [ECF 76-1 (Walker Dep.) at 17:17–21 ("[2014] was the first time that I had started digging into our PMA because that was the first time that it was my understanding that SSER was somehow going into a calculation for these [sales] objectives.")].

That said, a reasonable jury might alternatively determine that Coastal's understanding of the SSER was "inherently unknowable" prior to 2017 because, despite Coastal's reasonable diligence in flagging its concerns to NNA between 2014 and 2016, NNA did not clarify the definition of "represented" in the SSER calculation.  As such, Coastal only knew that there was a problem, but did not know the cause.  Cambridge Plating, 991 F.2d at 26–28 (finding that the "inherently unknowable" query does not turn on whether an injury was discoverable through reasonably diligent efforts but rather on the reasonableness of the purported victim's actions to

---

[19] The August 27, 2013, letter from NNA, which informed Coastal of the distributor's transition to SSER, stated that "[y]our regional field personnel will contact you soon to review your dealership's sales performance using SSER" and that "[t]hey will answer any questions [Coastal] may have as to this transition."  [ECF No. 77-1 at 2].  Based on the record before the Court, it is unclear if and to what extent NNA and Coastal conferred on this issue.  See, e.g., [ECF No. 79-1 ("I am writing in response to your letter dated 1/27/2015.  Since the receipt of your letter we have had correspondence and numerous discussions with regional representatives . . . .")].

learn of its cause of action); see also [ECF No. 77-3 at 2, 4 (2019 Letter from Coastal to Nissan) ("While your report [referring to a 2019 report] has a footnote that reads almost too small in print to see without a magnifying glass 'data in this report is based on represented PMAs' [i.e. excluding open points] at no point since Nissan switched to SSER from RSE has any representative from Nissan explained this to me")]. Here, Coastal alerted NNA three times as to its concerns relating to the PMA, and consequently, its SSER score and performance under the stair-step programs. [ECF No. 72 at 9–10; ECF No. 77-3 at 2 (Letter from Coastal to Nissan)]. Nonetheless, Coastal did not learn how the SSER was calculated or how it differed from NNA's prior metric, which had used open points for calculating sales effectiveness until June 2013. [ECF No. 70-4 at 14]; see also [ECF No. 76-1 (Walker Dep.) at 9:8–17 ("A. The issue with SSER – comes on two points. The biggest issue with SSER while it relates to the PMA, we did not become aware that the SSER score did not include the open points, and the unrepresented points, we didn't become aware of that until after we received the [2018] PMA audit and received some reports from Nissan which showed us that I believe the number was hundred percent of state market penetration in our PMA. . . . . So we knew in '14, but we didn't know hat [sic] the SSER score was from the state of Massachusetts." (emphasis added))]; [ECF No. 76-4 (Kittleson Dep.) at 12:12–15 ("Q. And prior to 2013, Nissan was using all of the geography, including open points for measuring sales effectiveness, correct. A. Correct.")]. As such, a jury could conclude that Coastal, despite acting diligently, could not have reasonably known of the injury caused by the SSER prior to the release of the audit in 2018–19.

As to Coastal's assertion that NNA "fraudulently conceal[ed] material pieces of information necessary for Coastal to fully comprehend the cause of its harm," [ECF No. 72 at 6], the Court finds no evidence in the record to support Coastal's argument. To toll the statute of

limitations based on fraudulent concealment, a defendant must show that a plaintiff concealed the existence of plaintiff's cause of action "through some affirmative act done with the intent to deceive." Szymanski, 778 N.E.2d at 27 (quoting Frank Cooke, Inc. v. Hurwitz, 406 N.E.2d 678, 685 (Mass. Ct. App. 1980)).  Although NNA did not share the slide deck containing the SSER formula, see [ECF Nos. 76-5, 76-6], the testimony cited by Coastal does not show that NNA acted with an affirmative intent to deceive, see e.g., [ECF No. 76-4 (Kittleson Dep.) at 8:1–9 ("Q. Do you know whether this document that explains SSER was ever provided to dealers back in 2013? A.  This document was not.  There was a dealer . . . explanation deck that was created. I don't believe it was . . . left with the dealers, but I believe it was given to regionals so that the field set could go over it with the dealers."); id. at 10:11–16 ("[T]his was an internal document that we used – to talk to the regions, the field personnel, and walk them through the change and see if they had any questions, but that's not the deck that would have been used for dealers.")].[20]

See also Szymanski, 778 N.E.2d at 27 (finding that plaintiff's theory of fraudulent concealment based on omission or silence was inadequate).[21] [22]

---

[20] Similarly, the Court finds no evidence of an intent to deceive by virtue of NNA not sharing a document that contained other dealers' PMAs.  See [ECF No. 77-4 (Adinolfi Dep.) at 6:7–23 (when asked about a 2019 email, see [ECF No. 77-5], that said that a document could not be shown to Coastal because it showed other dealers' PMA, Adinolfi responded, "[m]y email refers to other PMAs and so it was not Nissan's practice to share other PMA data . . . .  I think just as data, like giving out somebody's PMA maps is just not done.")].  This, in the Court's opinion, is insufficient to establish that NNA affirmatively acted to conceal information from Coastal.

[21] As to Coastal's alternative tolling theory, the continuing violation doctrine, [ECF No. 72 at 8], the Court notes that this doctrine is usually only applied "[i]n narrow circumstances, typically including Title VII and other discrimination claims," Quality Cleaning Prod. R.C., Inc. v. SCA Tissue N. Am., LLC, 794 F.3d 200, 205 (1st Cir. 2015), and is therefore not applicable to the present context.

[22] NNA further asserts that Coastal is estopped from retroactively seeking additional incentive money because the dealer failed to dispute NNA's payments under the stair-step programs in a

### ii.  __The Generalized Provision of Chapter 93B § 4(a)__

NNA further contends that "Coastal's claim against NNA in Count II must be dismissed to the extent that it is based on a purported violation of [] § 4(a), as opposed to [] § 4(c)(5)." [ECF No. 70 at 20].  NNA seemingly suggests that because it used the same SSER for all its dealers, the incentive programs, even if faulty, were "available on equal terms to all dealers," and therefore in violation of § 4(c)(5) rather than 4(a).  [Id. at 20–22]; see Mass. Gen. Laws ch. 93B, § 4(c)(5).  Because there was no violation of the more specific statute, that is § 4(c)(5), NNA avers that Coastal is foreclosed from bringing any claims under 4(a), the more general statute, in relation to the incentive programs.  [ECF No. 70 at 20–22].

As a threshold matter, the Court notes that the "interpretative principle that the specific governs the general" applies only where the general and specific statute are in conflict.  Nitro-Lift Techs., L.L.C. v. Howard, 568 U.S. 17, 21–22 (2012).  Here, based on the plain reading of the statute, the Court cannot discern a conflict or tension between § 4(a) and § 4(c)(5).  In

---

timely manner.  [ECF No. 70 at 18–20].  There is, as discussed supra, a triable issue of fact as to when Coastal discovered or should have discovered its injury, and, consequently, the Court will not make a determination on this issue.

Separately, the Court notes that NNA has not pled the requisite elements of an equitable estoppel defense, namely "1) a material misrepresentation by [plaintiff]; 2) reasonable reliance thereon ...; and 3) disadvantage resulting therefrom."  CSX Transp., Inc. v. Ken's Foods, Inc., 310 F. Supp. 3d 254, 261–62 (D. Mass. 2018) (quoting K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir. 1989)); see generally [ECF No. 70].  In addition, unlike plaintiffs in Tom Rice Buick-Pontiac v. General Motors Corp., the case on which NNA primarily relies for its equitable estoppel claim, Coastal repeatedly alerted NNA of its concerns with regards to the PMA and consequent renumeration under the incentive programs.  Cf. 551 F.3d 149, 154, 157–59 (2d Cir. 2008) (finding that manufacturer/distributor-defendant could not be held liable because dealer-plaintiffs failed to notify defendant of their belief that the warranty claims required a higher reimbursement rate).

addition, <u>Am. Honda Motor Co. v. Bernardi's, Inc.</u>, relied on by NNA, is distinguishable.  There,

the SJC determined that two dealers could not assert claims against their distributor for

establishing a new dealership under § 4(1), § 4(a)'s precursor, because there was another

provision, § 4(3)(l), that provided relief to plaintiffs.  735 N.E.2d 348, 354–56 (Mass. 2000).

Specifically, § 4(3)(l) had a standing requirement that allowed existing dealers "covering the

same line make as that offered to the proposed franchisee . . . to petition the superior court [once

the distributor had given notice of its intent to set up a new dealership] to determine whether

such an appointment or proposed appointment is arbitrary."  Mass. Gen Laws. ch. 93B, § 4(3)(l)

(2000).  Because of the statute's "standing requirement . . . and specific procedures," <u>Bernardi's</u>,

735 N.E.2d at 356, the SJC ultimately found that it was the sole provision available to the dealers

to challenge the distributor's conduct.  <u>Id.</u> at 355.  No such similar provision exists in § 4(c)(5),

and the Court therefore finds <u>Bernardi's</u> inapposite to the instant case.

Accordingly, summary judgment is <u>DENIED</u> on Count II.

### 2. Count III

Under Count III, Coastal "seek[s] to permanently enjoin NNA from using improper

'stair-step' volume-based sales incentive programs . . . if such programs are derived from vehicle

registration data drawn from a dealer's unilaterally assigned PMA."  [Compl. ¶ 182].

"According to well-established principles of equity, a plaintiff seeking a permanent

injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction."  <u>Allstate Ins. Co.</u>

v. Fougere, 581 F. Supp. 3d 307, 318 (D. Mass. 2022), aff'd, 79 F.4th 172 (1st Cir. 2023) (quoting eBay, Inc. v. MercExchange, 547 U.S. 388, 392 (2006)).

Here, the Court grants summary judgment on Count III because the harm is reparable. Coastal has made no showing that the purported harm resulting from NNA's conduct cannot be remedied by money damages, making an injunction inappropriate.[23]  See generally [SOF; ECF No. 72]; Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) ("Irreparable harm is an essential prerequisite for a grant of injunctive relief." (citation omitted)).  Accordingly, summary judgment is GRANTED on Count III.

## III.     CONCLUSION

For the reasons set forth above, NNA's motion for summary judgment is DENIED on Count II and GRANTED on Count III.

**SO ORDERED.**

September 4, 2024                                     /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE

---

[23] Neither party disputes that the incentive programs at issue were terminated at the end of March 2021.  [SOF ¶ 10].  Rather, Coastal seeks to "permanently enjoin NNA from using improper stair-step volume-based sales incentive programs . . .  if such programs are derived from vehicle registration data from a dealer's unilaterally assigned PMA."  [Compl. ¶ 182].